The first case on submission that's Siffert v. City of Rome. We'll hear counsel in United Good morning, your honors. May it please the court, I represent Mr. Brown on his appeal from his conviction for possession of a firearm. I want to focus on the district court rulings and the government's aggressive and misleading cross-examination and closing arguments which we contend deprived Mr. Brown of a fair trial. The district court allowed the government to persistently badger the main defense witness, even allowing it to reopen its cross and badger her more, about her failure and the failure of her neighbors to complain to the CCRB or any other authority about the defendant's arrest. This line of inquiry was entirely misleading because the witness did not testify to anything that was illegal. There was no basis based on the witness's report of the event for anyone to complain to the CCRB or any other authority. She testified that Mr. Brown was rolling a marijuana joint when the police entered the building and that they went right to him and put him in handcuffs for the marijuana and only after that did they find a gun in a plastic bag and when they took Mr. Brown away, they took him away and the gun as well and the marijuana. Now the defense witness certainly contradicted the police testimony at trial that the police had found the gun in Mr. Brown's waistband, but the police said nothing on the scene to suggest that they would later say that they found it in his waistband. The witness testified clearly when pressed repeatedly on this by the prosecutor. They didn't say that. They only said, look what we found and took the gun along with Mr. Brown. So based on her testimony, there was no reason for anyone to report anything. There was no illegal conduct by the police. As far as anyone at the scene could tell, either the witness or her neighbors, it was a legal arrest for possession of marijuana in public view and a legal confiscation of a gun found nearby. Didn't the government, and please correct me if I'm wrong, but didn't the government ask sort of as a prelude to inquiring about whether any report had been made to the authorities to whom one complains about these things, whether she was upset by the way the arrest had gone down? They did. They asked her whether she was upset multiple times. And she acknowledged that she was upset. She said not really. She said no, not really. I think at least twice said no. And then finally the third time said kinda, said kinda upset, like she would be upset about anybody being arrested. But when the government came back on its reopening of Cross, they asked her again multiple times. So you said you were upset. You said you were upset. And the defense counsel kept objecting that the government was distorting the testimony. But the defense objections were just continually overruled. And there was not even any legitimate basis for this reopening of Cross Examination. It was all just based on this pretextual argument that some statements hadn't been turned over and there were no statements. There was some Rule 26.2 material that at least there was a question about whether it had been turned over when she was disclosed the day before trial? Yes, and then the notes were produced. Do I have the timing right? She was disclosed as a witness the day before trial? I'm not sure when she was disclosed, but her name was given at least the day before. That was the representation that was made on the record. Maybe two days before. And other information about her wasn't available. I think the defense counsel didn't have it available. And there were no statements. There were no witness statements. And the government doesn't even contend on appeal that these notes, the pages of notes that were turned over on the spot when the defense counsel, when they were demanded by the government, she turned them over right away and they included in the appendix a couple of phone numbers, maybe three phone numbers, a note about getting pizza and getting a subpoena and a reference to Jose or some other witness. No statements, nothing that could ever be termed as a Rule 26 statement. Nevertheless, they were allowed to reopen Cross, which had been closed. The government had said no further questions. And then the second assistant who apparently wasn't happy with the Cross, demanded the notes and asked to reopen. There was definitely an objection to the reopening, multiple objections. There was a whole presentation by defense counsel on the law that these were not witness statements, that there was no basis for this. Nonetheless, the government was allowed to reopen. And they really went to town on the witness and really badgered her repeatedly on why nobody called the CCRB, discussed it among themselves, complained about the defendant being dragged out when she never said, for something he didn't do, when she never described that scenario. And so what do we, what do we, if we agree with you, what do we hold? What, what do we, how do we articulate what the problem was that you're identifying? Unfair cross-examination? The problem was unfair and badgering cross-examination, which is a form of prosecutorial misconduct, but the court also allowed it and encouraged it even by overruling objection after objection. And then it was even worse. Part of the error here was that in summation, the government then distorted the witness's testimony multiple times, and particularly in rebuttal, to be that which it had tried to get her to say, but which she never said. It claimed repeatedly that she testified that she saw an innocent man get arrested for something he did not do, that she, quote, saw an innocent man dragged away for something he didn't do, that he was, quote, put in handcuffs and dragged away in front of two dozen people for a crime he did not commit, and that no one reported it or said anything. That multiple objections were overruled, and finally, despite the witness's testimony that the police arrested and handcuffed Mr. Brown for the marijuana, you know, before they found the gun, and her specific denial that the police ever said they would pretend the gun came from Mr. Brown, the government asked the jury finally, its final pitch on this issue, in summation, was, use your common sense, and ask what would happen if the police, quote, arrested someone for something you can see they did not do, if they pulled the gun out of a bag and then said, arrest this guy for this, it's his, just after walking in, don't you think someone would say something? That never happened, according to this witness's testimony. It was a gross and blatant distortion of her testimony. And so that's just classic prosecutorial summation misconduct. All this was objected to, the reopening of Cross, the persistent and misleading badgering on the failure to report, and the distortion of the testimony in summation. All the objections were overruled. Therefore, you know, reinforcing in the jury's mind that this was legitimate. And clearly the judge was kind of misled by the government as well to think that this was somehow a legitimate line of attack. And it was not harmless. I mean, credibility was the main issue in the case. The credibility of this witness, this was the defense. You know, it was an unusual case where a bystander witness was willing to come in and say what she saw. Ms. Cassidy, if I could ask you to turn to the question of the second degree assault under the New York penal law, section 120.05, paren 1, paren. Has that issue now been resolved by virtue of the decision of this court yesterday? No, it has not, Your Honor. Tell me why not. Why not? Because the decision yesterday, the court's decision yesterday in Thompson did not address omissions at all. And our entire argument is based on the fact that you can commit this crime in New York, this crime can be committed by an omission. It doesn't require an affirmative act. Thompson was a pro se case. It was argued pro se. It probably, apparently didn't raise the issue. It was certainly not addressed, the issue of omissions. And this court has held that questions neither brought to the attention of the court nor ruled upon are not considered as having been decided so as to constitute precedent. So this issue of the omission is pending right now in a case that's been argued before another panel in United States v. Scott, and that's 18-163. It's been pending since January 10th when it was argued. Can you give us that again? 18-163. And that case is U.S. v. Scott. It was argued by our office on January 10th, and it directly presents the omissions argument. Does that case also involve 120.05 paragraph 1? No, it involves manslaughter, which involves the same elements except causing death. So it's the same argument. All right. Thanks very much. Okay. Thank you. I've reserved two minutes. Mr. Sobelman? You might begin by addressing that question first. You sent us a letter yesterday regarding Thompson against Barr. Maybe you can tell us what the government's view is on that. Yes, Your Honor. May it please the court. My name is Robert Sobelman, and I'm an assistant United States attorney in the Southern District of New York. I represent the United States on this appeal and in the district court. Judge Kovanec, I'll turn first to the issue of whether Thompson essentially decides the issue in this case, and the government's belief is that, yes, it does. The holding is clear. It is squarely on point. Defense counsel is correct that the argument was not made with respect to omissions in the briefing in the Thompson case, but under this court's precedent, the holding is nonetheless binding. That being said, the court would reach the same decision if it had considered the briefing in this case. It is clear that where in this particular context, with the elements of this particular crime, also would constitute a crime of violence. An omission in this particular context, and I'll turn to the elements of this crime in a moment, constitute the use if a defendant is purposely availing himself or herself of force, even if that person is not the impetus for the force. Now, the elements of this crime are three, and the crime I'm talking about, of course, is 120.05 subsection 1, which makes it a crime with intent to cause serious physical injury to another person. He causes such injury to such person or to a third person. I just want to pause before I get to the elements to note that the Scott case involving manslaughter does not involve the same elements. The elements under manslaughter does not involve an intent to cause that type of injury. That's why it's manslaughter, not murder. Three elements here. First, voluntary act, or what the defense focuses on, an omission which under New York law is the failure to perform an act as to which a duty of performance is imposed by law that the defendant is physically capable of performing. The second is that the act or omission must be the cause of the serious physical injury, meaning that it must actually contribute to the resulting injury as a, quote, sufficiently direct cause, such that the ultimate harm should have been reasonably foreseeable. And third, the defendant has to have intended to cause serious physical injury. I'm sure your honors looked at the definition of serious physical injury, but I want to remind the court that it's physical injury which creates a substantial risk of death or which causes death or serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ. This is not a minor injury. This is not an accident that has occurred. There is intent to cause serious physical injury, and the act has to be taken with intent to do that physical injury to another person. In the hypotheticals that are floated by defense counsel and briefing and other similar cases, those hypotheticals are in some cases crimes that were found to be committed in other cases that have been upheld by the New York Court of Appeals or other New York courts that involve omissions, do involve the use of physical force. Use here is merely the purposeful availment. It does not mean that the individual has to punch someone in the face or stab them in the stomach. Indeed, in Castleman and this court in Villanueva, they address these kind of outlier examples of sprinkling poison. In Villanueva, this court even acknowledges that if one were to take the defense argument to its logical conclusion, one pulling a trigger on a gun, which is a very minimal, literal physical use of force by one's finger, is not the act that directly causes one to be convinced that shooting someone is a use of physical force. Mr. Soltman, Villanueva does not involve a statute that is exactly like this 120.05 subsection 1. It has something else in it, am I correct? Yes, Your Honor. Villanueva involved first degree assault in Connecticut, and it also involved a career criminal act, which is an analogous context that this court's found is essentially the same inquiry. The elements are very similar but not identical. The important thing for this court in applying Villanueva is that it looks at Castleman and says, our analysis in light of Cherzynovsky needs to be a little bit different. Cherzynovsky was written without the benefit of Castleman, and that under Villanueva, and this is at page 128, the inquiry focuses on the causation of a consequence rather than the physical act of initiating an action that leads to a consequence. It's not the physical act by an individual that is the use of force. It's the availment of the use of force. What I was getting to was Connecticut statute has the element of causing such injury by means of a deadly weapon or a dangerous instrumentality. That element is missing from 120.05. Yes, Your Honor, you're correct. And certainly that is an added factor that accrues to that statute's benefit in this analysis when looking at a crime of violence. But that need not be present, and that case did not turn on whether a dangerous instrument was used. It was an intentional act that they use a dangerous instrument, then it is a crime of violence. But if one uses something that is not in the statutory category of a dangerous instrument, for example, a car to run someone over, if the car is not within the definition of a dangerous instrument, then that takes it out of the definition. That cannot be the distinction that makes a difference here. Well, it does relate to the issue of the omission. Under New York law, do you think it is fanciful or speculative that a person can violate 120.05 subsection 1 by, say, denying someone medical care? Your Honor, it's not fanciful. We don't have an example. Isn't there a case that does, in fact, say that, Miranda? Yes, Your Honor. Under New York law, that is. Yes, Your Honor. In the government's view, that is a crime of violence. That meets the elements here. And you're relying on Castleman for that? Yes, Your Honor. Castleman, Hill, and Villanueva. The purposeful availment of force in that circumstance, to deny someone medical care where you owe a legal duty, or to deny someone nutrition where an illegal duty is owed, for example, in a parent-child relationship, one is availing themselves of the force of the disease in the medical context. That knowing that the disease is ravishing one's body, by not seeking medical care, only here, where there's a duty imposed by law to seek that, and with the intent to cause physical injury to that person, and with the intent to, sorry, and actually causing such serious physical injury to that person. It is not the case where a parent denies their child medical care, and then they simply, that's automatically a crime of violence. There are other elements here that must be met. And that's why it's a crime of violence. If it was negligence, it's not a crime of violence. The case law is clear on that. The reason that type of omission could be a crime of violence is the other elements in this case. Your Honors, if you'll permit, I'll turn briefly to address the trial issue, unless Your Honor has an additional question. No, thank you. Ms. Defense Counsel raised the issue of Lakeisha Phillips' testimony at trial. And one thing I wanted to clarify with respect to Judge Hall's question is that the name of that witness, and every other defense witness that was listed, and there were many on the list, even though only two were called, was the day before trial. And the government repeatedly asked Defense Counsel for more information about those individuals, and was told they simply didn't have any. They didn't have addresses. They didn't have phone numbers. They had nothing that they were either willing or able to share with us. And we made a record on that in front of the district court. And it wasn't until the judge ordered them to that they provided us some very basic information about some of the witnesses, one of whom we were only given a nickname, Jimbo, and that was the other witness that testified at the trial. We weren't even given a legal name. It was attempted trial by surprise, and the district court didn't appreciate it, and neither did the government. So after being told that there was no information available and that no notes had been taken, both the district court and a full record had been made on this, the district court and the government were shocked when the defense witness testified that notes had been taken during the meetings. Now the notes certainly weren't substantive in the way that the government's 3,500 materials are, but there's a mechanism in 26.2 if an attorney believes that something is either protected by work product or privilege or not substantive such that it should be released, and the defense counsel did not take advantage of that at all. Your Honors, I see that I'm over time. I'm happy to continue addressing the issue, but I don't want to overstay my welcome. Thanks very much. Thank you, Your Honors. Ms. Cassidy, you've reserved some time. Just briefly, on the issue of the notes, the phone numbers that were jotted down on a piece of paper were by no stretch of anyone's imagination could possibly constitute 26.2 witness statements. So yes, defense counsel represented that they had no 3,500 material for the witness because they did not. In fact, the numbers did not even include that witness's phone number. As it turned out, there were other people's phone numbers and they were simply investigative notes. The witness testified that no notes were taken at any meetings, that there were notes taken at the first introductory, like the first time she met the lawyer, and they were basically just notes about being there and interviewing and saying, we have to get a subpoena, notes to myself, I need to get a subpoena, that kind of thing. So there's no question that these should not have been turned over, never should have been turned over, were not required to be turned over. So that was just a pretext to reopen the cross because one of the lawyers was unhappy with the lack of aggressiveness of the first cross. That's what really happened. Now to answer a couple of the questions on the secondary assailant . . . You used the word misconduct earlier in your opening argument. Was that just a slip of the tongue or some . . . No, I'm talking about the summation specifically. You regard that as prosecutorial misconduct. Yes, as prosecutorial misconduct because it grossly distorted the witness's testimony, repeatedly, repeatedly. When you speak of misconduct, you think of something that's sanctionable, right? Well, I'm speaking of something that's an error. I think it's a very serious charge. It's prosecutorial misconduct in summation. There are several cases about it. There's the Friedman case and there's the Forlorma case, which was reversed for misstating evidence. It's a ground for reversal. It's a fair trial issue. That may be, but there must be a synonym for misconduct that may be more useful. I don't know. Go ahead. It was unfair, certainly unfair summation. Summation that mischaracterized the evidence. And then I'd also like to just address a couple of issues. On Villanueva, your Honors are correct that Villanueva did not address the same statute. It was a statute with a different element, use of a deadly weapon. It's not controlling at all of this case. Neither Castleman, Villanueva, nor Thompson discussed omissions at all. And it is clear that in New York State, unlike many states, it's not the case everywhere, but it's a bit unusual, that in New York, you can't commit manslaughter, first degree manslaughter, which are the same elements except death results. It's with intent to commit serious physical injury. It's the same. The government's argument is basically that just having the intent is the force. And if that were true, that would be the same with manslaughter. They are arguing that manslaughter is also a crime of violence. But that argument, the omissions argument, is pending right now before another panel. And they will decide it. And that would control this case. That would be controlling in this case. Whether the question whether . . . Thompson is not an omissions case. It doesn't address it at all. And it's a very different argument from indirect force. Castleman and Villanueva discussed indirect force, poisoning, things like that. But whether someone can be guilty of these crimes simply by doing nothing, by taking no action, by an omission, is a totally different argument. Thanks very much. We'll reserve decision.